Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the award, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner as follows:
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties at hearing before the deputy commissioner as
STIPULATIONS
1. The parties are subject to and bound by the provisions of the Workers' Compensation Act, the defendant-employer regularly employing three or more employees.
2. The employer/employee relationship existed between plaintiff and defendant-employer on February 26, 1988.
3. The Hartford Accident Indemnity Company was the compensation carrier on the risk on February 26, 1988.
4. A North Carolina Industrial Commission Form 21 Agreement approved by the Commission on May 25, 1988, constitutes an award of record and the same is incorporated herein by reference.
5. The Opinion and Award previously entered herein by Deputy Commissioner Tamara R. Warstler (Nance) on 3 February 1989, when the plaintiff was unrepresented, also constitutes an award of record and is incorporated herein by reference.
6. The plaintiff was hired by the defendant-employer on 19 November 1973. He was employed by the defendant-employer at different times as a maintenance helper, utility worker and subassembler. His general duties included mowing the grass and cleaning up trash.
7. The plaintiff sustained an injury by accident arising out of and in the course of his employment with the defendant-employer on 26 February 1988 resulting in injuries to his neck, right arm and lower back.
8. The plaintiff returned to work with the defendant-employer following the stipulated accident on 28 March 1988.
9. Following the accident, the plaintiff was employed with the defendant-employer until 9 October 1989.
10. Trend Line Furniture Company was sold to Cochrane Furniture Company on 14 October 1989 and the plaintiff was officially terminated by Cochrane on 14 October 1989.
11. The plaintiff's average weekly wage was $294.28, which yields a compensation rate of $196.20.
12. Plaintiff, Ronald W. Kale, received unemployment benefits through the Employment Security Commission of North Carolina from approximately October 21, 1989 to approximately April 21, 1990. Said benefits were in the amount of $156.00 per week.
13. During the time that he received said benefits, Ronald W. Kale certified to the Employment Security Commission of North Carolina that he was willing and believed he was able to work at gainful employment.
* * * * * * * *
Based upon all the competent, credible evidence of record, the Full Commission adopts the findings of fact of the deputy commissioner and finds as follows:
FINDINGS OF FACT
1. Ronald Kale was born 01 March 1947 and was forty-six years of age at the time of the hearing. He is currently forty-seven years of age. He has been married for 29 years and is the father of four children. Following the birth of their first child, his wife never worked outside the home until after the stipulated injury by accident.
2. Mr. Kale completed the seventh grade and quit school after the eighth grade when he turned 16. He is functionally illiterate, having scored below the third grade level on reading recognition ability and arithmetic on the Wide-Range Achievement Test administered by Randy Adams. He has been trying to qualify for a G.E.D. since 1988. He has a learning disability that preexisted the stipulated injury by accident. Mr. Kale's I.Q. scores fall in the mentally retarded range for verbal score; the performance score is in the borderline range and the full scale I.Q is in the low portion of the borderline range.
3. The plaintiff's work experience consists of upholstery trimming, driving a truck, grounds maintenance, driving a forklift, staining furniture, work as a cotton mill laborer, employment as a laborer, employment as a handyman, and work on the side as an automobile mechanic.
4. Prior to the stipulated accident, Mr. Kale received special recognition from the President of Trend Line Furniture (the defendant-employer for fifteen years of meritorious service to the company. Moreover, in the year immediately prior to his accident, he was recognized by the defendant-employer for having perfect work attendance.
5. On 26 February 1988, the plaintiff sustained an injury by accident to his neck, right shoulder, right arm and lower back which arose out of and in the course of the plaintiff's employment with the defendant-employer when a dump truck the plaintiff was driving for his employer collided with a car. In the course of this collision, the dump truck turned over. Plaintiff was taken by ambulance to the emergency room for treatment. He was treated in the emergency room and released to go home on the date of the accident with precautions for dealing with head injury.
6. Ignorant of the need to obtain authorization from his employer, plaintiff sought treatment for his injuries from a chiropractor, Robert Chapin, beginning 29 February 1988. Mr. Kale complained to Dr. Chapin of pain in the neck and stiffness with head pain and headaches, hearing difficulty, right shoulder pain with weakness in the right arm, and chest pain with rib pain that hurt when he took a deep breath. Mr. Kale's complaints to Dr. Chapin also included low back pain. Mr. Kale had never seen Dr. Chapin before being injured in the stipulated accident.
7. Dr. Chapin saw Mr. Kale through 3 January 1989. When last seen by Dr. Chapin, Mr. Kale continued to have cervical and thoracic pain, with right shoulder and right hand pain, and headaches. His low back complaints never resolved.
8. Mr. Kale was also treated by Dr. Crumley, who referred Mr. Kale to Hickory Orthopaedic Center, P.A. Mr. Kale was treated by Dr. Baum at Hickory Orthopaedic Center beginning 3 March 1988. Mr. Kale related to Dr. Baum that he remembered getting hit, and going in the ambulance to the hospital. He was not sure whether he lost consciousness, but felt that he must have, because he could not remember the ride to the hospital.
9. On 3 March 1988, Dr. Baum examined the plaintiff and diagnosed a cervical and right trapezial strain and lumbar sprain.
10. On 17 March 1988, due to the plaintiff's continued problems, Dr. Baum ordered an MRI scan of the cervical spine. The MRI did not detect any problem other than degenerative changes. Dr. Baum released Mr. Kale to return to work on 28 March 1988.
11. In obedience to his doctor's instructions and despite continuing pain, Mr. Kale returned to work on or about 28 March 1988. He returned to his duties driving the trash truck and working in maintenance.
12. Prior to the accident, Mr. Kale's main duties were to drive the trash truck, load trash boxes and mow grass. Once he returned to work a little over one month after the accident, Mr. Kale worked for defendant-employer until 9 October 1989. Mr. Kale's duties after the accident were much the same as before the accident, although after the accident he did not maintain company vehicles. Also, unlike the year prior to the accident when his attendance was perfect, he missed work due to numerous doctor's appointments.
13. In the initial period after returning to work following the accident, there were a few days when Mr. Kale came in late and said he had particular difficulty getting up in the morning. Generally, he thereafter was on time although he continued to have significant physical problems and saw Dr. Chapin alone 31 times between 9 May 1988 and 3 February 1989. He also saw Dr. DePercell three or four times on referral from Dr. Chapin in that period at his own expense.
14. Some four years later, Mr. Kale's supervisor, Wayne Chapman, could still recall the plaintiff's reports of right shoulder and neck pain. Mr. Chapman alleged that the plaintiff did not complain to him of having difficulty remembering things or concentrating. Mr. Chapman further testified that he did not observe anything that led him to believe Mr. Kale was having trouble remembering things. However, Mr. Chapman felt Ronald was a poor risk at the time the company was bought out by Cochrane and made a report to that effect.
15. Mr. Kale's co-worker, Fred Harill, worked with Mr. Kale, and saw him six to twelve times during the course of a typical day. He worked together with Mr. Kale on occasions before and after the accident. Almost four years after he last worked with Mr. Kale, Mr. Harill testified that he did not notice any difference in the job Mr. Kale did before the accident and once he came back, after the initial period when he was out of work. However, he did recall that Mr. Kale mentioned to Mr. Harill his neck and shoulder pain, and specifically recalled one occasion when Mr. Kale had difficulty with a task which Mr. Kale confessed was due to a lack of grip in his right dominant hand.
16. A new company, Cochrane, bought out defendant's employer, Trend Line, on 14 October 1989. Approximately 30 employees were eliminated by the new employer. Trash collection was contracted with an outside party and college students were used in the summer to mow the grass. Mr. Kale was not employed by the new employer. Mr. Kale's two main jobs were hauling trash, and mowing grass. Although the defendant offered evidence that Mr. Kale's dismissal was not related to his stipulated injury by accident, the injuries sustained on 26 February 1988 were a factor in Cochrane's decision not to hire Mr. Kale. The growing season for grass begins before and extends beyond summer vacation for college students and there is no evidence that any other jobs in maintenance were eliminated.
17. Following the purchase of his employer's company, and his being let go by the new employer, Mr. Kale unsuccessfully sought work with a number of other employers including the sister Cochrane plant. He also sought and received unemployment benefits through the Employment security Commission of North Carolina from approximately 21 October 1989 to approximately 21 April 1990. Said benefits were in the amount of $156.00 per week.
18. While still employed by defendant Trend Line, Mark Spell of Trend Line referred Mr. Kale to Dr. Rudy Santoso for evaluation and treatment. Dr. Santoso is trained as a neurologist and psychiatrist. Mr. Kale reported to Dr. Santoso that the car which had hit him was small, and went under his truck. He reported to Dr. Santoso that his truck rolled over about 2 1/2 times. He stated he got banged around inside the cab of the truck, and was holding tight on the gear shift with his right hand. He does not remember exactly what happened, but felt something pop in his neck. Mr. Kale was not sure whether be bumped his head or not, but felt that most likely he did not. He remembered getting out of the dump truck, and sitting on a bank, but could not remember clearly what happened next until the ambulance came to pick him up and brought him to the emergency room of Lincoln County Hospital. Thus, he had posttraumatic amnesia.
19. Mr. Kale complained to Dr. Santoso that since the accident, he had right neck, shoulder and arm pain. He also reported headaches. Dr. Santoso diagnosed cervical and right shoulder sprain, low back strain, and combined vascular and muscle tension headaches.
20. Dr. Santoso prescribed an acupuncture regimen. On 9 August 1989, Dr. Santoso noted cervical spondylosis, and calcification at the L4-5 disc level, suggesting chronic disc herniation. He indicated he had nothing further to offer Mr. Kale.
21. Overlooking the spinal problems he had previously noted, on 19 September 1989, Dr. Santoso opined that the plaintiff had a 4% permanent partial disability to his right upper extremity.
22. Continuing to have problems and now out of work for more than six months, plaintiff was evaluated by Dr. Stutesman at the Work Recovery Center on 6 June 1990. She noted neck, shoulder and low back pain. On physical examination, Dr. Stutesman found plaintiff's range of motion limited with respect to his right shoulder. Dr. Stutesman's impression was cervical sprain and strain, with secondary myofascial pain disorder, sacroiliac arthralgia, right biceps tendonitis, and right carpal tunnel syndrome. Dr. Stutesman recommended physical therapy, and a back school program. Plaintiff underwent a physical therapy program, and a back school program, at Catawba Memorial Hospital.
23. Plaintiff was discharged from the Catawba Memorial Hospital program on 10 August 1990. Therapy modalities gave plaintiff temporary relief, but he continued to experience cervical discomfort and right shoulder discomfort.
24. Through a friend, plaintiff managed to obtain a temporary job from 1 August to 10 September 1990 for Nylon Crafters. This job involved driving a forklift truck. The plaintiff was not able to obtain permanent employment with Nylon Crafters. Despite his inquiries and applications with a number of employers, the temporary employment with Nylon Crafters was the last employment plaintiff has been able to obtain.
25. Thereafter, Dr. Stutesman prescribed a work hardening program, with the goal of placing plaintiff in an appropriate permanent job.
26. When Mr. Kale was discharged on 16 November 1990, he had a 26% permanent partial impairment to the back, a 28% permanent partial impairment of his right upper extremity and a closed head injury. Plaintiff was motivated to return to active employment.
27. When Ronald Kale was discharged from Dr. Stutesman's facility, the defendants offered him no vocational assistance in actually finding a job despite the fact that they knew of his injury, his limited job skills, and knew, or should have known, that he had been out of work since he was discharged on 14 October 1989, with the exception of the brief employment he himself obtained, but was unable to retain with Nylon Crafters.
28. Although he had no job and had been without permanent work for more than a year when Dr. Stutesman discharged him, the defendants terminated the rehabilitation nurse that had been working with the plaintiff and offered no further vocational assistance, although he was paid temporary total disability benefits during the time he was in Dr. Stutesman's program and defendants knew Mr. Kale was not returning to a job with the defendant or any other employer earning a wage equal to or greater than the one he had earned with Trend Line.
29. As a result of his injury by accident, the plaintiff is in constant pain and cannot do repetitive bending, stooping, or squatting. He cannot lift more than 10 pounds and that not frequently. He should not sit for long periods of time (more than 30 minutes). He should not stand more than 30 minutes at a time. He must be able to change positions with regularity and when his symptoms necessitate it.
30. The plaintiff is depressed. His chronic pain and the inactivity and inability to do the things he did prior to the accident resulting from the stipulated injury by accident have significantly contributed to said depression, which is a direct and natural result of the stipulated injury by accident.
31. The plaintiff reached maximum medical improvement with respect to his injuries on or before 16 November 1990. He has not reached maximum medical improvement from his depression causally related to the stipulated injury by accident.
32. Plaintiff's usual and customary vocation is grass cutter and medium size truck driver. Because of his occupationally related conditions, plaintiff can no longer perform his customary occupation.
33. There was no evidence that the defendant-employer ever offered the plaintiff an opportunity to attempt to return to work at his former employment or any other employment with the defendant-employer after his discharge by Cochrane on 14 October 1989. Similarly, there was no evidence that the defendant-employer offered the plaintiff assistance with vocational placement or that there was any employment with another employer that the plaintiff could obtain and retain.
34. As a result of the stipulated injury by accident on 26 February 1988 and the chronic pain and depression resulting therefrom, the plaintiff has been incapable of earning any wages with the defendant-employer or any other employer from 14 October 1989 to the present.
35. Although there was evidence that the plaintiff was physically capable of some work activity, due to the preexisting conditions of the plaintiff, his limited education, his functional illiteracy, and limited work experience, the compensable injuries and their attendant chronic pain and depression caused the plaintiff a greater degree of incapacity for work than the same injury might cause some other person with superior education or work experience or who had more intellectual capacity.
36. As a result of the plaintiff's stipulated injuries by accident on 26 February 1988 and the chronic pain and depression resulting therefrom, plaintiff will require continuing monitoring and medical care in order to effect a cure, give relief or lessen plaintiff's period of disability.
37. On 26 February 1988 the plaintiff sustained a closed head injury by accident arising out of and in the course of his employment with the defendant-employer.
38. On 26 February 1988 the plaintiff sustained an injury to his right wrist resulting in carpal tunnel syndrome by accident arising out of and in the course of his employment with the defendant-employer.
39. As a result of the above described accident and the previously stipulated injuries to his neck, low back and right arm, the plaintiff retains permanent impairments to his back of 26%, to his right upper extremity of 28% and significant permanent impairment of his mental function as a result of his compensable closed head injury.
40. A preponderance of the credible evidence indicates that there were no suitable jobs available that the plaintiff was/is capable of obtaining and retaining, taking into account his pre-existing physical, mental and vocational limitations and his compensable injuries and resulting physical and mental impairments.
41. As a result of the stipulated injury by accident on 26 February 1988 and injuries and chronic pain and depression resulting therefrom, his unsuccessful attempt to return to the job market with Nylon Crafters notwithstanding, the plaintiff has been incapable of earning any wages with the defendant-employer or any other employer from 14 October 1989 to the present.
42. As a result of the plaintiff's stipulated and adjudicated injuries by accident on 26 February 1988 and the chronic pain and depression resulting therefrom, plaintiff will require continuing monitoring and medical care in order to effect a cure, give relief or lessen plaintiff's period of disability.
43. The plaintiff is entitled to compensation for total disability beginning 14 October 1989 and continuing for as long as he remains so disabled.
44. Plaintiff has elected to receive compensation for actual wage loss in lieu of the rating.
* * * * * * * *
Based on the above findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. On 26 February 1988 the plaintiff sustained a closed head injury by accident arising out of and in the course of his employment with the defendant-employer.
2. On 26 February 1988 the plaintiff sustained an injury to his right wrist resulting in carpal tunnel syndrome by accident arising out of and in the course of his employment with the defendant-employer.
3. As a result of the above described accident and the previously stipulated injuries to his neck, low back and right arm, the plaintiff retains permanent impairments to his back of 26%, to his right upper extremity of 28% and significant permanent impairment of his mental function as a result of his compensable closed head injury.
4. The plaintiff's chronic pain and the inactivity and inability to do the things he did prior to the accident resulting from the stipulated injury by accident have significantly contributed to plaintiff's depression, which is a direct and natural result of the stipulated injury by accident. Starr v.Charlotte Paper Company, 8 N.C. App. 604 (1970); Hill v. HanesCorp., 319 N.C. 167 (1987); Fayne v. Fieldcrest Mills, Inc.,54 N.C. App. 144 (1981).
5. Plaintiff met his initial burden of proving disability by the expert medical testimony offered together with the testimony of the plaintiff and his wife. Kennedy v. DukeUniversity Medical Center, 101 N.C. App. 24, 398 S.E.2d 677
(1990). In addition, disability is presumed to continue even though the plaintiff has reached maximum medical improvement.Watson v. Winston-Salem, North Carolina Transit Authority,92 N.C. App. 473, 374 S.E.2d 483 (1988). Following his release from Dr. Stutesman's rehabilitation program on 19 November 1990, prior to which he had received three weeks of temporary total disability benefits from the defendants, there was no evidence that the defendant-employer ever offered the plaintiff an opportunity to attempt a return to work at his former employment or any other employment with the defendant-employer. Similarly, a preponderance of the credible evidence indicates that there were no suitable jobs available that the plaintiff was/is capable of obtaining and retaining, taking into account his preexisting physical, mental and vocational limitations and his compensable injuries and resulting physical and mental impairments. Thus, defendant did not come forward as it must with persuasive evidence that plaintiff is capable of obtaining employment. Kennedy v.Duke, supra.
6. As a result of the stipulated injury by accident on 26 February 1988 and injuries and chronic pain and depression resulting therefrom, the plaintiff has been incapable of earning any wages with the defendant-employer or any other employer from 20 November 1990 to the present. G.S. § 97-29; Hilliard v.Alex Cabinet Company, 305 N.C. 593, 290 S.E.2d 682 (1982).
7. Although there was evidence that the plaintiff was physically capable of some work activity, due to the preexisting conditions of the plaintiff's limited education, his functional illiteracy, and limited work experience; the compensable injuries and their attendant chronic pain and depression caused the plaintiff a greater degree of incapacity for work than the same injury might cause some other person with superior education or work experience or who had more intellectual capacity. G.S. § 97-29; Hilliard v. Apex Cabinet Company, 305 N.C. 593,290 S.E.2d 682 (1982).
8. As a result of the plaintiff's stipulated and adjudicated injuries by accident on 26 February 1988 and the chronic pain and depression resulting therefrom, plaintiff will require continuing monitoring and medical care in order to effect a cure, give relief or lessen plaintiff's period of disability. G.S. 97-25; Little v. Penn Ventilator, 317 N.C. 206,345 S.E.2d 204 (1986); Tyler v. G.T.E. Products Co., 333 N.C. 258,425 S.E.2d 698 (1993).
9. The plaintiff is entitled to compensation for total disability beginning 14 October 1989 and continuing for as long as he remains so disabled. G.S. § 97-29; Whitley v. Columbia LumberManufacturing Co., 318 N.C. 89, 348 S.E.2d 336 (1986).
10. Defendants are entitled to a credit for the monies earned by the plaintiff during the brief period he worked for Nylon Crafters in August and September of 1990 and for the three weeks of temporary total disability previously paid to the plaintiff in November 1990 against the compensation herein awarded.
* * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the deputy commissioner and enters the following
AWARD
1. Defendant shall pay plaintiff total disability compensation at the rate of $196.20 per week from 14 October 1989 and continuing until the plaintiff returns to work or defendant obtains permission from the Industrial Commission to cease payment of total disability compensation. Defendants are entitled to a credit for the monies earned by the plaintiff during the brief period he worked for Nylon Crafters in August and September of 1990 and for the three weeks of temporary total disability previously paid to the plaintiff in November 1990 against the compensation herein awarded and counsel for the plaintiff shall provide documentation thereof to defendant within twenty days of this order. Compensation which has accrued shall be paid to plaintiff in a lump sum, subject to the attorneys' fees set forth herein. Thereafter, compensation shall be paid weekly subject to the attorneys' fee hereinafter awarded.
2. Defendant shall pay all medical expenses incurred, or to be incurred by the plaintiff as a result of his compensable injuries sustained on 26 February 1988 and the chronic pain and depression resulting therefrom for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief, or will tend to lessen plaintiff's period of disability, when bills for the same shall have been submitted to defendant and approved through procedures established by the Industrial Commission.
3. A reasonable attorney fee of twenty-five percent of the compensation due under Paragraph 1 of this Award is approved for plaintiff's counsel and shall be paid as follows: Twenty-five percent (25%) of the lump sum due the plaintiff shall be deducted from that sum and paid directly to plaintiffs counsel with equal amounts going to Mr. Harper and Mr. Thomas. Thereafter, every fourth compensation check shall be deducted from the monies otherwise due the plaintiff and paid directly to plaintiff's counsel with one check in the amount of $98.10 being sent directly to Mr. Harper and another in the same amount being sent directly to Mr. Thomas.
4. The defendant shall pay the costs due this Commission.
 S/ _____________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/ _____________ COY M. VANCE COMMISSIONER
S/ _____________ WILLIAM L. HAIGH CHIEF DEPUTY COMMISSIONER
BSB:md